J. B. WILDER & CO. v. S. C. & C. M. WILSON.

1. SALE OF GOODS. *Power to resell. Sub-vendee. Title of.* A conditional sale of a retail stock of goods, with an unlimited power in the vendee to resell, enables the latter to give to a *bona fide* sub-vendee a good title as against the original vendor.

2. SAME. *Same. Bona fide purchaser.* A wholesale firm sold a retail stock of drugs and fixtures to a purchaser partly for cash and partly on time, reserving the title until the price was fully paid, but with power in the vendee to resell and control the proceeds, and without any understanding as to whether the vendee should sell at wholesale or retail, although the parties may have contemplated that the goods would be retailed; the vendee proceeded to dispose of the drugs by retail, adding to his stock from time to time, until only a small remnant of the original purchase remained, when he sold this remnant, together with the fixtures and new stock, to a *bona fide* purchaser. *Held*, that the latter acquired a good title as against the original vendor.

3. QUERE. *Conditional sale. Public policy.* Quere, whether a conditional sale of a stock of goods, reserving title in the vendor, but giving the vendee an unlimited power to sell, would not be so inconsistent in its terms, and so contrary to public policy, as to render the condition void?

FROM HARDEMAN.

Appeal in error from the Circuit Court of Hardeman county. T. J. FLIPPIN, J.

A. M. LAMBETH, JR., and F. FENTRESS for Wilder & Co.

WOOD & MCNEAL for Wilson.

COOPER, J., delivered the opinion of the court.

The complainants, who are wholesale druggists of Louisville, Kentucky, about February 15, 1877, sold

Wilder & Co. *v.* Wilson.

to the defendant, S. C. Wilson, a retail stock of drugs, which they had previously sold to one Martin, of Booneville, Mississippi, and had been compelled to take back. The sale was for about $850, partly for cash, and partly on time. The purchaser removed the goods to Middleton, Tennessee, and continued in the retail business as a druggist at that place, adding from time to time about $2,000 worth of drugs to his stock, bought principally from other parties, until April 15, 1878, when he sold out to his brother, the defendant, C. M. Wilson, for $700, partly in satisfaction of a pre-existing debt and partly in consideration of the assumption and payment by the vendee of a debt due from the vendor to a third person. The contract of sale was in writing, attested by witnesses, and the purchaser at once took out a license as a retail druggist, and continued the business, adding to the stock from time to time, until March 24, 1879, when the present attachment bill was filed by complainants. Two agents of the complainants had previously, during the year 1878, visited Middleton to see about the debt due from defendant, S. C. Wilson, to complainants, and were advised of the sale of the stock by S. C. to C. M. Wilson. The original bill and a subsequently amended bill sought to reach the goods and effects attached, partly upon the ground that the sale from S. C. to C. M. Wilson was colorable and fraudulent, and partly upon the ground that the title to the drugs sold by the complainants to S. C. Wilson had been retained by the complainants until the purchase price was fully paid. Upon

final hearing, the chancellor dismissed the bill, but gave complainants a decree against S. C. Wilson for the unpaid balance of their debt against him. The complainants appealed from the decree dismissing the bill. The Referees have reported in favor of affirmance, and the complainants except.

The proof is clear that the defendant, S. C. Wilson, was indebted to his brother, C. M. Wilson, at the time of the trade between them, principally for borrowed money, in a sum larger than the value of the stock and fixtures sold; that in consideration of the sale, C. M. Wilson agreed to assume, and did assume and pay the sum of $246, due by S. C. Wilson to a third person, and credited the residue of the purchase price on his debt or demand against S. C. Wilson; that the stock so sold was at once turned over to the purchaser, who procured a license, and proceeded to carry on the business for himself openly, and with the knowledge of complainants; and that he continued in the business, adding to the stock from time to time, until closed up by the proceedings in this case. Under these circumstances, we concur with the chancellor and the Referees in the opinion that the complainants have failed to make out a case of fraud in fact, in the sale of the one defendant to the other. The sale was an open one, for a sufficient consideration paid, and not merely colorable, or intended to secure any benefit to the vendor.

The bill alleges that complainants proposed to defendant, S. C. Wilson, originally to take the stock of drugs in Martin's hands, remove them to Middleton,

Wilder & Co. *v.* Wilson.

where he lived, and sell them out for complainants, which proposition was refused by him. But, the bill continues, the said defendant "proposed to your orators that he would take said stock of goods at wholesale prices, if your orators would give him time to sell them, and pay your orators the price agreed upon at wholesale, and he retain all the profits he could make out of the goods. Your orators, through their agent and partner, Thos. O'Mara, agreed to the proposition, with the understanding, which was agreed to by the defendant, S. C. Wilson, that said stock of goods, together with any and all additions that might become necessary to be made to said stock of goods to run a country drug store, together with the fixtures, accounts, notes and moneys, should be and remain the property of J. B. Wilder & Co., until said stock of goods was paid for in full." These allegations are denied by the defendant, S. C. Wilson, in his answer and deposition. O'Mara testifies as follows: "I agreed to sell it (the stock of drugs) to him for one third cash, the balance due during the following winter, the stock to be considered ours until paid for in full." This witness admits that there was no such agreement as to the only bill of goods afterward sold by complainants to S. C. Wilson. He further says, "there was no understanding as to whether Wilson should sell the goods at wholesale or retail, the only agreement being that they should be ours until paid for." He is asked: "Was it understood between you and Wilson that as fast as he could sell the stock at retail, he was to pay you for

the stock?" His answer is: "No, sir; he was to
pay a third cash, and the balance during the follow-
ing winter."

The Referees find that the title of the goods sold
was to be retained until the purchase price was paid,
and that "the parties contemplated that the goods
should be retailed." They hold, as matter of law,
that the reservation of the title of a stock of goods
in the vendor, where the purchaser has the power to
sell, is void as against public policy. The defendants
have not excepted to the finding of fact, but the
complainants have excepted to the conclusion of law.

It is the settled law of this State that a contract
for the sale of personal property is valid, by which
the possession passes to the purchaser, while the title
is retained by the seller until the purchase money is
paid. But a sale of such property by the purchaser
would be a conversion, and the sub-vendee would
acquire no title: *Houston* v. *Dyche*, Meigs, 76. On
the other hand, our courts have also held that if a
person is put in possession of personalty by the owner,
and at the same time clothed with the usual *indicia*
of title which give authority to sell, a sub purchaser
may acquire a title good against the owner: *Cherry*
v. *Frost*, 7 Lea, 1; *Taylor* v. *Pope*, 5 Cold., 416.
It seems to follow as of course, that if the purchaser
of such property, though by conditional sale, be ex-
pressly given the power to sell, and he does sell, the
sub-vendee would get a good title. And the courts
of New York, by whom conditional sales are recog-
nized as valid, accordingly hold that where the agree-

ment confers on the conditional vendee the right to sell, or a right inconsistent with the continued ownership of the original vendor, the transaction is fraudulent as against both creditors and purchasers: *Sudden* v. *Hazen,* 31 Barb., 650; *Fitzgerald* v. *Fuller,* 19 Hum., 180; *Comer* v. *Cunningham,* 77 N. Y., 391.

There is a conflict among the authorities in relation to the validity of a chattel mortgage, or trust assignment of a stock of goods made to secure particular debts, by the terms of which the mortgagor or assignor is to remain in possession of the goods with power to sell the same in the usual course of trade, any additions to the stock to be in lieu of the goods sold. This court has declared such assignments to be invalid as against public policy, and tending to delay creditors: *Tennessee National Bank* v. *Ebbert,* 9 Heis., 153; *Nailer* v. *Young,* 7 Lea, 735. There is a similar conflict of authority over the validity of a conditional sale of a stock of goods, with a like power of sale in the usual course of business: *Lewis* v. *McCabe,* 21 Am. L. Reg., 217, and note. Some of the authorities sustain the validity of such conditional sales to the extent of the property not sold in the usual course of business, upon the ground that the sales under the power would simply pass the title of the original vendor: *Burbank* v. *Crooker,* 7 Gray, 158; *Rogers* v. *Whitehouse,* 71 Me., 222. But the Supreme Court of Connecticut, while following these decisions, in *Lewis* v. *McCabe,* *ut supra,* pointedly say: "If, however, the contract in question must be construed to mean that the

plaintiff (the vendor) authorized McAvoy (the vendee) to sell the property as his own, we should be constrained to hold it so absolu'ely inconsistent with the retention of title in the plaintiff as to waive or make void the condition."

In this State we have no direct decision upon the point. There is an intimation in one case that this court, in analogy to its holding in regard to trust assignments as above, would probably treat a conditional sale of chattels, with power in the purchaser to sell, as tending to hinder and delay creditors, or as contrary to public policy: *McCombs* v. *Guild,* 9 Lea, 86. And there is, certainly, a striking analogy between a chattel mortgage of a stock of goods to secure a creditor, with power in the mortgagor to sell, and a conditional sale with a reservation of the title for the security of the vendor, with a like power to sell.

The contract in the case before us, as set out in the original bill, is the exact equivalent of the mortgage or trust assignment, which our courts have condemned. The stipulation there is: "That said stock of goods, together with any and all additions that might become necessary to be made to said stock of goods to run a country drug store, together with the fixtures, accounts, notes and moneys, should be and remain the property of J. B. Wilder & Co. until said stock of goods was paid for in full." The proof, it is true, and the report of the Referees, only goes to the extent of showing a reservation of title in the goods sold. And the complainants' own proof shows

Wilder & Co. v. Wilson.

that there was no agreement as to whether a sale, under the power given to the vendee, was to be by wholesale or retail, and that the vendee was not required to pay over the proceeds of sale, or account for them.   A long credit was given for that part of the purchase money which was not to be paid in cash.   There was by the contract, as proved and found, a reservation of title, with an unlimited power of sale, and absolute control by the vendee of the proceeds of sale.   The facts bring the case within the comment of the Supreme Court of Connecticut cited above, and the contract must be construed as giving the vendee the power to sell the property as his own.   Such a power, as said by that court, is "absolutely inconsistent" with the reservation, and the condition is necessarily void.

But it is unnecessary to determine in this case whether the condition is void altogether or not.   It is enough that the power of sale was sufficient to give the purchaser a good title.   And if the power to sell was unlimited, the sale under consideration being in good faith, and, as we have seen, for a sufficient consideration, would be good.   The Referees, it is true, say "the parties contemplated that the goods should be retailed."   But they do not say, and could not say with truth, that it was so stipulated in the contract.   And the remnant of the original stock embraced in the sale to C. M. Wilson is shown to have been only worth about fifty dollars.   The fixtures are put at a higher figure, but there is no pretense that they were to be retailed.   Whatever may

have been the rights of the complainants, under the reservation, to claim any of the property which they could have found unsold in the hands of their vendee, they can not follow any of those goods in the hands of a *bona fide* sub-vendee. The power of sale, not being limited by the contract, is sufficient to protect the sub-vendee.

The exceptions to the report of the Referees will be disallowed, and the chancellor's decree affirmed. The complainants will pay the costs of this court. The costs of the court below will be paid as directed by the chancellor.